UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| BETTY DUSANGE-HAYER <br> ISHAN HOLDINGS AND DEVELOPMENT <br> CORPORATION <br><br> Plaintiffs, <br><br> v. <br><br> KARNALYTE RESOURCES INC., ROBIN PHINNEY, <br> QUENTIN PLESTER, JULIUS BRINKMAN, <br> HENRY KERKHOVEN, SOKURN SUE NG, <br> VISHVESH D. NANAVATY, SANJEEV V. VARMA, <br> MUKUND PUROHIT, JOHN DOE 1-10, AND <br> JANE DOE 1-10 <br><br> Defendants | CIVIL ACTION NUMBER: 2:15-CV-4341-DCN-BM <br><br> COMPLAINT INVOLVING <br><br> 1. FRAUD & DECEIT <br> 2. CIVIL CONSPIRACY <br> 3. RACKETEERING (R.I.C.O.) <br> 4. CONSPIRACY TO ENGAGE IN A <br>    PATTERN OF RACKETEERING ACTIVITY <br> 5. UNFAIR BUSINESS PRACTICES, AND <br> 6. RELATED CLAIMS <br> 7. DAMAGES FOR $9.5 MILLION <br><br> DEMAND FOR JURY TRIAL |

## *COMPLAINT*

NOW COME, Plaintiffs, Ishan Holdings and Development Corporation ("Ishan"), and Betty DuSange-Hayer as a *pro se* litigant to file this *Complaint* which is predicated on acts of fraud, deceit, civil conspiracy, racketeering, conspiracy to engage in a pattern of racketeering activity, unfair business practices, and other related claims, which took place from Charleston, Myrtle Beach, Hilton Head, South Carolina, among other places, including but not limited to Savannah, Georgia, and all of which are actionable against the Defendants under the *Racketeer Influenced and Corrupt Organizations Act, 1970* (commonly known as civil *RICO*).

## *INTRODUCTION*

This is a complex civil action seeking *Racketeer Influenced and Corrupt Organization Act* ("RICO")

remedies authorized by the federal statutes at *18 U.S.C. 1961, et seq.*; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this honorable *United States District Court* deems just and proper under all circumstances which have occasioned this initial COMPLAINT. See *18 U.S.C. §§ 1964 (a) and (c)* ("Civil RICO").

The primary cause of this action is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* crossing international borders and U.S. State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts.

The predicate acts alleged here cluster around racketeering, criminal conspiracy, tampering with evidence, concealment of evidence, obstruction of due process and obstruction of justice. See *18 U.S.C. §§ 2319, 2320, 1512, 1513, 2315, 1503, 1510, 1511 and 1581-1588* respectively.

Other *RICO* predicate acts, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.* mail fraud, bank fraud, international telephone calls originating on U.S. soil within the United States, and emails made to conduct and carry various racketeering schemes. See *18 U.S.C. §§ 1341 and 1344*, respectively.

The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon the Plaintiffs.

## JURISDICTION

This honorable Superior Court has original jurisdiction pursuant to the civil RICO remedies at *18 U.S.C. 1964*, and the holdings of the *U.S. Supreme Court* in <u>Tafflin v. Levitt</u>, *493 U.S. 455 (1990)*, and the *U.S. Court of Appeals for the Ninth Circuit* in <u>Lou v. Belzberg</u>, *834 F.2d 730, 4 (9th Cir. 1987)*.

Without question South Carolina has jurisdiction to prosecute crimes that occur within its borders. See *S.C. Code Ann. § 1-1-10 (Supp. 2002)* ("The sovereignty and jurisdiction of this State extends to all places within its bounds ….").

The Plaintiffs allege that racketeering and conspiracy as prohibited by the *Racketeer Influenced*

and Corrupt Organizations Act of 1970 (RICO) occurred herein as Defendant Robin Phinney crossed international borders into the United States, and into the states of South Carolina and Georgia and possibly other locations, for the purpose of utilizing communications which originated domestically within the United States, and while he was conducting business for Defendant *Karnalyte Resource, Inc.* ("Karnalyte"). These communications involved phone calls, emails and text messaging.

Mr. Phinney also sought to influence the RICO related activities of each and every one of the Defendants, as did the Defendants conspired together to affect the racketeering activities of Mr. Phinney.

Relevant to the above opening remarks, the extensive use of *RICO* in the civil context is almost solely attributable to the inclusion of mail and wire fraud as predicate acts. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500, (1985). The mail and wire fraud statutes essentially make it criminal for anyone to use the mails or wires in furtherance of a scheme to defraud. Note that the fraudulent statements themselves need not be transmitted by mail or wire; it is only required that the scheme to defraud be advanced, concealed or furthered by the use of the U.S. mail or wires. See *18 U.S.C. §§ 1341, 1343*.

A mail or wire fraud violation can be premised on a non-disclosure if there is an independent duty of disclosure that the defendant has breached. *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015).

As a general rule, a scheme to defraud must relate to past or presently existing facts. In *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010) a plaintiff must allege that some kind of deceptive conduct occurred in order to plead a *RICO* violation predicated on mail fraud.

The Plaintiffs have irrefutable standing in this United States District Court as the Plaintiffs have clearly suffered an "injury in fact" which is both concrete and particularized, as well as, actual or imminent (See *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351*

*(1992))*. Secondly, there is a definite causal connection between the injury suffered by the Plaintiffs and the conduct of the Defendants. This injury in other words is absolutely traceable to the actions of the Defendants as in *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S. Ct. 1917, 48 L. Ed. 2d 450 *(1976)*.

Commenting further on the above mentioned elements, pursuant to *Kinsley v. Network Assocs., Inc.*, 312 F.3d 1123, 1126 (9th Cir. 2002) the Supreme Court has noted that the injury cannot be "conjectural or hypothetical". This ruling is consistent with the fraud, racketeering, conspiracy, and *RICO* charges contained in this *Complaint*.

## INTRODUCTION

1. This litigation is a *RICO* related case brought by Ishan and Ms. Betty DuSange-Hayer against Karnalyte Resources, Inc. ("Karnalyte"), Robin Phinney, (CEO of Karnalyte), Quentin Plester (Karnalyte's corporate counsel), other Karnalyte Directors: Henry Kerkhoven, Sokuen Sue Ng, Vishvesh D. Nanavaty, Sanjeev V. Varma, Mukund Purohit, and John and Jane Does 1-10 respectively, as predicated acts have occurred from the United States. Some of these people spend substantial time in the United States and conduct business while in the United States.

2. Ishan is based in British Columbia, Canada and Ms. Betty DuSange-hayer is a Canadian citizen, and businesswoman. Since December 14, 2010, Canadian corporation Karnalyte has been publicly traded on the *Toronto Stock Exchange* (TSX) under the symbol KRN. Ishan alleges that Karnalyte and its executive management, legal counsel, and others engaged in a pattern of racketeering activity and practices, fraud, deceit, conspiracy to commit fraud, the engagement of unfair business practices, and other related claims.

3. In and around November of 2011, Karnalyte and Ishan began communication and shortly thereafter they entered into an agreement whereby Ishan would assist Karnalyte in arranging financing.

4. On March 7th, 2013, *Gujarat State Fertilizers and Chemicals Ltd.* ("GSFC") invested approximately

Canadian funds $44.7 million into Karnalyte.

5. Prior to GSFC investing $44.7 million, Ishan arranged for meetings, paid for airfares, hotels, set up appointments with many high level officials, which included but were not limited to the Chairman of the Board of GSFC, the Director of the Ministry of Chemicals and Fertilizers. There were many other high ranking private and public companies from various states at all of these discussions which took place in India. In excess of five hundred emails exist reflecting the work performed by Ishan during this period leading up to the first tranche of $44.7 million being invested.

6. Ishan assisted, in fact by contract actually spearheaded, arranging the above mentioned financing for Karnalyte. Ishan never received the fee that was due and it was not reimbursed for expenses it incurred arranging the financing.

7. Since the investment was completed by GSFC, Ishan had decided not to assert any lawsuit or litigation against Karnalyte, in part due to the difficulties CEO, Mr. Robin Phinney, was facing at the time. These problems culminated in his ouster as CEO, President and a member of the Board of Directors of Karnalyte, on June 27th, 2014.

8. Upon Mr. Phinney's reinstatement as President and a member of the Board of Directors, on May 21st, 2015, Ishan continued its work with Karnalyte and arranged for further investment into the company.

9. On June 3rd, 2015, Mr. Robin Phinney and Mrs. Jean Phinney met with Mr. Erwin Singh Braich and others in Richmond, British Columbia. At one point during this long meeting, former Member of the Legislative Assembly in British Columbia, Mr. Dave Hayer, joined the meeting. When Ms. Betty DuSange-Hayer drove Mr. and Mrs. Phinney back to Vancouver International Airport in order for them to fly back to Calgary, Alberta; both Mr. and Mrs. Phinney were ecstatic, exuberant and specifically mentioned it was Karnalyte's and their "good karma" to have met Mr. Braich.

10. It was agreed that Ishan would not have a representative, attend Karnalyte's

Annual General Meeting ("AGM") on June 23rd, 2015, in Saskatoon, Saskatchewan. It was further decided with Karnalyte's management that the need for representatives of the funding group, brought in by Ishan, would not be attending in Saskatoon, as Mr. Phinney represented to Ishan and The Braich Group that he had the right to bind the company. This appeared consistent with all previous "settlement agreements" which emphasized the fact that the shareholders didn't have to approve certain things.

11. After much negotiation and work on all sides, an agreement for this further investment had been signed by Mr. Robin Phinney. Again it was clearly stated that this would be a binding agreement on all parties.

12. The above mentioned agreement that was signed by Mr. Phinney, was further revised after much due diligence was performed by the *The Braich Group of Companies and Trusts* ("The Braich Group"). Ishan had arranged for travel between British Columbia, to Alberta and then to Saskatchewan by representatives of The Braich Group.

13. The above mentioned revised agreement, dated August 26th, 2015, is for a subscription of new capital stock in Karnalyte for an initial cash injection of $198,450,000, plus a $400 million loan facility for Karnalyte to build the first phase of the plant and begin production by 2017. If the warrants were to be exercised that are attached to this investment, Karnalyte would receive an additional $238,625,000. Discussions are already underway for a further investment of $2.5 to $3 billion to expand the project in Wynyard, Saskatchewan, to a capacity ranging between 6 to 8 million tonnes of various grades and types of potash production per year. This new issuance of shares was priced at a approximate 600% premium to the ten day trading average of Karnalyte stock.

14. During a conference call on or about September 21st, 2015, with Karnalyte's CEO - Mr. Phinney, other members of the Karnalyte team, Ms. Betty DuSange-Hayer, several lawyers participating on the call, representatives of Karnalyte insisted that a fee for Ishan be inserted into the binding document

that was to be distributed to the Board of Directors. Of the several lawyers on the call, those that were representing the subscribing party (The Braich Group), undertook to have its solicitors revise the mutually agreed upon binding document and deliver it to Karnalyte within hours.

15. Karnalyte requested this document as soon as humanly possible so that it could be presented to all of the directors of Karnalyte in person in Toronto, or electronically for those directors not in Toronto.

16. It was understood by all on the conference call, that a binding deal existed between all parties, and the lock-up period had already kicked in. The knee-jerk "clarification" press release issued by Karnalyte with regards to the above mentioned financing, completely mischaracterizes the true binding nature of the agreement.

17. Even before the insertion of the specific fee earned by Ishan, it had been agreed upon by the Karnalyte team that they were going to Toronto only to "listen" to what GSFC might have to suggest with respect to various issues. In fact on Sunday, September 20th, 2015, at a dinner meeting that took place between Mr. Robin Phinney, Mrs. Jean Phinney and Mr. Erwin Singh Braich, at *Saboroso Brazilian Steakhouse*, it was discussed by all three individuals in attendance that since there was a binding agreement, Mr. Robin Phinney perhaps should not even be travelling to Toronto.

18. Ishan has much evidence dating back many years to the current day, proving everything that is asserted in this claim, which includes but is not limited to letters, emails, texts, voicemails and witnesses etc.

19. To date Ishan has not received what it is owed, since its work began with Karnalyte in 2011.

20. After her client, The Braich Group (on September 21st, 2015) had their lawyers send the agreement to Karnalyte representatives in Toronto, Mr. Erwin Singh Braich, on September 24th, 2015, received three phone calls of a troublesome nature. These intimidating calls were received approximately an hour subsequent to the conference call that took place with Karnalyte's director, Mr. Henry Kerkhoven, Mr. Erwin Singh Braich and Mr. Satinder Dhillon. This cordial conference call commenced at 5:48 PM (Saskatoon local time) and was for a duration of 40 minutes and 27 seconds.

There is a file open at the Saskatoon Police Service due to the threats that were made, some suggesting the loss of life of Erwin Singh Braich (File No.15-92486 opened on September 25th, 2015).

21. On October 20th, 2015, after Ishan had filed a lawsuit in New Westminster, British Columbia, on October 6th, 2015, one wheel fell off of Ms. Betty DuSange-Hayer's vehicle while she was driving. A police report was filed in Richmond, British Columbia, (File No. RI-15-34312) and an investigation has begun to find out who tampered and loosened the bolts on the tire to cause it to fall right off of the vehicle while Ms. DuSange-Hayer was driving. All very knowledgeable individuals (mechanics, tow truck operators, insurance personnel etc.), have unanimously agreed that this was not the work of simple vandals.

22. This case is extraordinary. The facts are many and sometimes complex. They include things that normally come out of Hollywood - such as communications between Robin Phinney and other parties describing arrangements, posturing and interactions as part of an overall scheme to defraud and injure Ishan, Ms. Betty DuSange-Hayer and her client The Braich Group, and defraud also the shareholders of Karnalyte and certain other former and/or current Board Members of Karnalyte. Death threats which are being investigated by Canadian authorities (as mentioned above). Furthermore due to the possible criminal activity surrounding Ms. DuSange-Hayer's motor vehicle, (as described above), there are two police departments in two provinces in Canada now investigating these matters. Robin Phinney kept secret from key personnel, including members of Karnalyte's Board, much information and important agreements. Also involved is Karnalyte's Corporate Counsel (Quentin Plester) and the Head of the Capital Markets (Julius Brinkman), who attended under false pretenses, meetings held in Germany.

23. The evidence is voluminous. Due to the involvement of more than one country (Canada, India U.S.A. and Germany), this has become an international escapade.

24. Perhaps Robin Phinney began his involvement in this controversy with a desire to improve conditions within Karnalyte after thwarting an almost two-year attempt by GSFC from carrying out an unfair takeover. It should be noted that after the $44.7 million financing was completed by GSFC, the principle asset of Karnalyte was written down to salvage value, ($4 million), by its auditors, KPMG.

25. To be sure, Mr. Phinney sought also to do well for himself while doing good for others and there was nothing wrong with that. In the end, however, Mr. Phinney and Karnalyte's lawyer, Quentin Plester further divided and corrupted the Board. They have possibly submitted fraudulent or incomplete evidence, and are possibly still submitting fraudulent evidence by misinforming Karnalyte's new attorneys at *Norton, Rose, Fulbright Canada, LLP*. They induced a consulting firm (*Ishan Holdings & Development Corporation*) with whom Robin Phinney had prior dealings, to bring Karnalyte an investor because Phinney did not trust GSFC. In fact, Phinney stated often, that he believed GSFC and others were involved in misappropriating in excess of $10 million. Phinney also stated that KPMG had maliciously, perhaps fraudulently, written the asset down.

26. There had long been talk amongst the company of an alleged $700,000,000 financing proposal that GSFC had supposedly procured, however, prior to the postponed *Annual General Meeting* the management, directors and shareholders had not been shown any written evidence of the subject financing proposal.

27. They then told half-truths or worse to Ishan, Ms. Betty DuSange-Hayer, Erwin Singh Braich, The Braich Group and others who will testify in this matter, as an attempt to prevent exposure of that and other wrongdoing. If ever there were a case warranting equitable relief with respect to a judgment procured by fraud, this is it.

28. Robin Phinney is, no doubt, resourceful at his role at Karnalyte. It's been suggested that he saved the company from an unfair takeover by GSFC. Despite several brand new

Board Members were appointed at the AGM on June 23, 2015, ill feelings and a lack of trust remains within the company between various parties. Mr. Robin Phinney and numerous other Karnalyte executives and senior management repeatedly stated to Ishan and The Braich Group that certain Board Members were in a position of conflict and could not vote on specific matters.

29. Regardless of this circumstance the ends do not justify the means. There is no "Robin Hood" defense to account for the illegal and wrongful conduct which has gone on. The wrongful actions of Robin Phinney, other Defendants, and Karnalyte's legal team would be offensive to the laws of any nation that aspires to the rule of law. It has also been alleged that offshore accounts for former members of the Karnalyte team were set up with the guidance of KPMG.

## BACKGROUND

30. Ms. DuSange-Hayer has had a long term business relationship with Karnalyte. She assisted in the deal between GSFC and Karnalyte (as detailed above) which involved the GSFC securing a 19.98% stake in Karnalyte for $44,700,000 (5,490,000 common shares at $8.15/share).

31. Also, GSFC agreed and committed to an "off-take agreement" for the purchase of approximately 350,000 tonnes per year ("TPY") of potash extracted from Phase 1 of Karnalyte's Wynyard Carnallite Project; and potentially increasing to 600,000 TPY with the completion of Phase 2. The off-take agreement is to continue for approximately 20 years from the commencement of commercial production of Phase 1.

32. As for Ishan and Betty DuSange-Hayer, neither Karnalyte nor GSFC paid her a commission for the work she had performed. The first phase of the financing between Karnalyte and GSFC has been completed. Further segments of this agreement are yet to be completed and likely now will not ever occur. In an abundance of caution and due to Karnalyte's pattern to date Ishan and Ms. Betty DuSange-Hayer have lost faith in Karnalyte doing what is just and right, as it is now believed that Ishan was induced into bringing yet another round of financing to the table, just so that she would not

sue on the previous monies that were owed. Mr. Phinney and others, under false pretense, had Ishan working for them with no intention of paying what was owed. And now given the fact that a police investigation has begun into the incident involving Ms. DuSange-Hayer's vehicle, the trust has been lost between parties, to say the least, and she is thankful to God to even be alive to file this Complaint.

33. After being introduced by Ishan, Robin Phinney was eager to have Mr. Braich and his Group participate as the major investor in Karnalyte. Mr. Phinney spoke openly with Mr. Braich about not trusting GSFC. Mr. Phinney openly stated he was not happy with KPMG having done what they did. According to Phinney GSFC's new and revised funding proposal utilizing a bank in India was "crap and garbage". These comments and consequential events occurred specifically due to actions by Robin Phinney while on American soil.

34. According to Mr. Robin Phinney, Karnalyte's auditor (KPMG) had written down the company's main asset to a paltry $4,000,000. This is highly suspicious insofar as their motive is concerned. In absolute amazement Mr. Phinney watched GSFC agree to this write down.

35. Also troubling to Mr. Phinney was the fact that on April 13, 2015, Karnalyte announced publicly in a press release the company's intention to sell its asset in Wynyard.

36. Based upon Mr. Phinney's assertions, and having conducted much of their own due diligence, The Braich Group structured its binding subscription offering with enough cash and a loan, to begin Phase I of the Wynyard Carnallite Project. In addition the exercising of all the warrants by The Braich Group would jump start Phase II as well.

## ADDITIONAL FACTUAL BACKGROUND

37. *Karnalyte Resources Inc.* is engaged in the business of exploration and development of high quality agricultural and industrial potash and magnesium products. Karnalyte intends to develop and

extract a carnallite - sylvite mineral deposit through a known solution mining process at competitive costs and with minimal environmental impact. Using a staged approached to potash plant construction, Karnalyte plans to operate a solution mining facility that will initially produce 625,000 tonnes of potash per year, increasing to 2.125 million tonnes of potash per year. Karnalyte owns a 100% interest in Subsurface Permit KP 360A and Subsurface Mineral Lease KLSA-010 located near Wynyard, Saskatchewan, comprising a total of 85,126 acres.

38. Karnalyte's common shares are traded on the Toronto Stock Exchange (TSX) under the symbol KRN.

39. The Braich Group was introduced to Defendant Phinney by Plaintiffs Ms. Betty DuSange-Hayer and Ishan Holdings and Development Corporation. Robin Phinney and his wife Jean Phinney traveled, on June 3rd, 2015, to Vancouver, British Columbia to attend the a meeting with representatives of The Braich Group.

40. In his travels between South Carolina and Georgia, Mr. Robin Phinney sent emails and other communications by way of U.S. internet servers and telephone lines. His actions were intentionally meant to mislead, deceive and defraud the Plaintiffs. Obvious damage has occurred to parties which may be filing their own litigation in this matter.

41. During the month of August 2015, members of The Braich Group traveled to Alberta, to meet with many senior members of Karnalyte's management team, at their then corporate offices in Okotoks, Alberta. While there The Braich Group representatives also met with members of Mr. Phinney's family. Numerous discussions and meetings were held at local restaurants and the *Lakeview Inn and Suites*. In fact Plaintiff Betty DuSange-Hayer stayed at the Phinney residence during the entire week.

42. In the last week of August 2015, members of The Braich Group travelled to Saskatoon, Saskatchewan, to continue their due diligence requirements. They also had several meetings with senior

and key Karnalyte personnel while there and they met Mr. Phinney's eldest son, who they had yet to meet.

43. Leading up to September 21st, 2015, Mr. Phinney and other Karnalyte senior management vigorously pushed The Braich Group to submit, through their counsel, the final terms of the binding agreement that had been negotiated and agreed to and memorialized in writing on August 26th, 2015. This was to include the Subscription Offering details, mutually agreed terms relating to loan facilities and draw down dates, exercising of options and warrants and so forth, all of which was done to the satisfaction of the Karnalyte senior executives.

## COUNT ONE – FRAUD & DECEIT

Fraud & Deceit

*18 U.S.C. §§ 1961(5), 1962(d)*

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein. Substance prevails over form.

## COUNT TWO – CIVIL CONSPIRACY

Conspiracy to Engage in a
*Pattern of Racketeering Activity*:
*18 U.S.C. §§ 1961(5), 1962(d)*

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein. Substance prevails over form.

## COUNT THREE – RACKETEERING (R.I.C.O.)

Acquisition and Maintenance of an Interest in and Control of
an *Enterprise* Engaged in a *Pattern of Racketeering Activity*:

*18 U.S.C. §§ 1961(5), 1962(b)*

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate

same by reference, as if all were set forth fully herein.  Substance prevails over form.

Each Defendant singularly and collectively are liable for agents' misconduct: knowledge of, participation in, and benefit from a *RICO* enterprise.

### COUNT FOUR – CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY

Conduct and Participation in a RICO *Enterprise*
through a *Pattern of Racketeering Activity*:

*18 U.S.C. §§ 1961(5), 1962(c)*

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein.  Substance prevails over form.

There can be no denying that the Defendants' conduct involved a pattern of racketeering.  To complete its racketeering plans, Karnalyte, and previous management even relied on the accounting firm of KPMG to write down the company's main asset to $4,000,000.  This was not only a deceptive act but an unconscionable one, as well.

### COUNT FIVE – UNFAIR BUSINESS PRACTICES

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein.  Substance prevails over form.

### COUNT SIX – RELATED CLAIMS

Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein.  Substance prevails over form.

Plaintiffs reserve the right to add to the *Complaint* as subpoenas are issued and new evidence is discovered and possibly other related claims come to light.

### RELIEF REQUESTED:

**Wherefore**, pursuant to the statutes at *18 U.S.C. 1964(a) and (c)*, the Plaintiffs request judgment against all named Defendants as follows:

When examined singularly or as a whole, counts one through six have had the same end result. Namely that Ishan and Ms. Betty DuSange-Hayer has been denied by the Defendants monies that are owed, in the amount of Canadian Funds $9.5 million. Plus an additional pro-rata amount from future production and sales.

In light of this happening, as based on the specific wrongful acts by the Defendants, the Plaintiffs prays that judgment be found in favor of the Plaintiffs for actual, consequential, and punitive damages, and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of *18 U.S.C. 1962(d) supra,* according to the best available proof.

Consequently, that all Defendants pay to the Plaintiff treble (triple) damages, under authority of *18 U.S.C. 1964(c),* for any gains, profits, or advantages attributable to all violations of *18 U.S.C. 1962(d) supra,* according to the best available proof.

### JURY DEMAND

Plaintiffs hereby demands trial by jury on all issues triable by a jury lawfully convened.

Submitted October __23__, 2015.

_____
Betty DuSange-Hayer, *pro se*
c/o #301 – 10090 – 152nd Street
Surrey, British Columbia, Canada
V3R 8X8
(604) 818-5078

## CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of the aforementioned *Complaint* was mailed first class, and postage prepaid, to each Defendant named in the *Complaint*, this _____ of October, 2015.

 

_____
Betty DuSange-Hayer, *pro se*
c/o #301 – 10090 – 152nd Street
Surrey, British Columbia, Canada
V3R 8X8
(604) 818-5078